Mexican Radio Corporation v. NLRB. Well, Ms. Salazar, it looks like you're losing the whole audience here. That's fine by me, Your Honor. We'll wait just a minute so we can give you our full attention and not be distracted. Thank you. Just let the door close. Just a minute. Ms. Salazar, good morning. Good morning. May it please the Court, I'm Dana Salazar from Mexican Radio Corporation. Every day employees and managers interact. Every day employees advocate for more money, a better schedule, a different boss. Every day employees get together to discuss work, to complain, to get advice. Sometimes they meet in person, sometimes over the phone, by email, by group email, text, Snapchat, Facebook, probably some other social media that I'm not aware of because I'm too old. And in all of these cases, the employees are talking about two whys. They're talking about working conditions and things that employees wish were different. But when does advocacy for better working conditions cross over into insubordination? When does it go too far? When does the manager have the right, the responsibility to other employees to take actions? That's the question I believe that's presented in this case. I think it's also the question that's reflected in Document 111 that was presented by opposing counsel, where the NLRB is seeking assistance in setting those guidelines, the scope. That call for input is more directed in the union context. And Mexican Radio Corporation was not a union shop. There was never an indication that the employees were attempting to form a union or to otherwise collectively bargain. Right now, the standard is that. What difference would that make? The difference it makes is that if I'm a union shop or if my employees come to me and say, we're considering advocating and forming a collective bargaining union, then I know that I'm covered by the National Labor Relations Act. And I know that protected concerted activity towards the activity. That would seem to say that the only way people can have concerted activity to have input into their work is by seeking to join a union. I think the distinction is whether the retaliation or the discipline was directed towards the employees for banding together or for the message that they were sending. And I think the distinction is important. This was not a case where people were terminated for banding together, but for agreeing with an underlying, insubordinate, distasteful. Was it all? Was that email all insubordinate? The email was four pages long. It wasn't all insubordinate, but it certainly had the tone and flavor of insubordination, calling for other employees not to respect the manager that was in place, making accusations about the shareholders that they were embezzlers and engaged in fraud, and that none of them deserved respect. I think it makes it very difficult, particularly given the fact that those accusations were disseminated to all the employees and were discussed among other employees, and the employees that were agreeing with it were also, in effect, adopting it, although opposing counsel would draw a distinction. For all you can tell from the responsive emails is that people agreed that their tips were being diverted to runners, whoever they are, and that the supervisor fails to respect them. I don't see why people can't get together to say, I agree with that. Why do you assume that the people who said, well, you know, me too, were agreeing that the employer is an embezzler? Well, one of the responses was, I agree 100%. But for purposes of ---- Well, 100%. What if they said 1,000%? Would it be 10 times 100%? But that's the issue. We have a cocktail party going on. Why don't you hold on just a second, Ms. Salazar, while we get the masses to calm down. Sorry. We'll give you plenty of time, so please. I don't think we would be here if the email had simply said that we think we're being treated poorly by the manager and we think that the tip pool should be adopted, and that's why I left my job. This is the original email holder. And everybody else said, oh, thanks for bringing that up and we think that's great. I don't think that this would have gone the way it did if that was the extent of it, but that's not the extent of the email. The email went far beyond simply saying that there were certain issues that had been raised that hadn't been addressed. And the question of ---- What if the email had included just a simple sentence toward the end, and because of all of this I think we should organize a collective bargaining unit? I think that that would have also had a different effect. I think it would have had a different response from management, and it would have ---- Just the mere addition of those ten words or whatever. I do believe so, yes, Your Honor. But you can't lay out grievances, if you will, without including that language and come under the protection of the NLRA. I don't think it's that simple, but I think that when the ---- I don't think that you can say that every time employees group together to raise issues about workplace. That's too inclusive. It covers every dispute between every manager and every employee and every ---- Right, but here there's some assessment of what it was that went on, right, by the ALJ and then ultimately by the board. Which we objected to in our brief, Your Honor. The original complaint was as to that October 5th meeting and then the email, and then countless other incidents and interactions were all brought up as a basis to lay a foundation for a pattern of having raised issues. And there was no discipline as to any of those other emails to managers or to shareholders. There was never any discipline for any of the meetings. The only time that there was an attempt to discuss these issues with the employees was after the email was sent. And after the aborted conversation with the first employee, none of the other employees that were claimants here had any conversations with management beyond that. The first employee ran upstairs and told the other employees, we're all fired because we responded to this email, and they all walked out the door. But you're saying that they were all fired because they responded to the email. I did not say they were all fired because they were. You said that their misconduct, their insubordination was agreeing with the email. I said that there was. Then you sort of added that if it ended, you know, seeking to organize a union, it might be okay, but that's the first time I've heard an employer complaining that the employees are not organizing a union. I apologize if I miscommunicated our position. Go right ahead. I said that the email itself was insubordinate, it contained vulgar language, and it was a personal attack on the management, that the distinction that opposing counsel draws is that for purposes of establishing protected concerted activity, that email, because it raises working conditions, is protected concerted activity. And by agreeing with it by adoption, the agreeing employees are also engaged in protected concerted activity. But in his brief, he says, when you look at whether the foul language, the potential insubordination, and the negative aspects of the emails, those are not attributed to the agreeing employees. They want to have their cake and eat it, too, so that only the workplace condition complaints are adopted by the employees, but not any of the negative. That was the distinction that I was drawing. I was not conceding that they were terminated for agreeing with the email. I think the unfolding of how people were disciplined and how they left their jobs was quite a bit more complicated than that, as laid out in both briefs. So I'm sure I better understand what you're saying. What you are objecting to in your argument here is that the NLRB wants to sort of pick and choose out of the email what it is the other employees agreed to and then use that, saying that's concerted activity. That's the concerted activity at the basis. Correct, that the underlying email creates the protected concerted activity, but in terms of looking at whether it goes too far, you only look at the responding emails. And since they don't contain profanity or any insubordination, that the employees should not have been disciplined, talked to, or terminated. I'll reserve my time. Thank you. Thank you. You've reserved three minutes for rebuttal. Mr. Hickson, good morning. May it please the Court, Michael Hickson, for the NLRB. As the Board reasonably found, this case involves the company's response to its employees' repeated concerted attempts to raise their shared complaints regarding their working conditions to management. A three-month employee effort that ultimately culminated in the company's unlawful reprimand and discharge of employees Fagoth, Palamino, Santana, and Garcia. There really can be no question that the four employees' numerous efforts to raise their shared concerns constituted concerted activity for the purpose of mutual aid and protection, mutual aid or protection under the Act. And I guess maybe I should pause here just to respond briefly to the point that was made about a union shop, a nonunion shop. That point, Your Honors, is completely irrelevant. Section 7 of the National Labor Relations Act is extraordinarily broad. It applies to all statutory employees, regardless of whether they have formed a union or attempted to form a union. And it includes not only the right to form, join, or assist a union, but also the right to engage in other concerted activities for the purpose of, dot, dot, dot, other mutual aid or protection. And I would direct Your Honors' principal – I mean, there's just a litany of cases both from the circuit courts and the Supreme Court on this point, but principally to the case 1962, NLRB v. Washington Aluminum. That's a Supreme Court case. It's cited in our brief. The site is 370 U.S. 9, holding that employees in a nonunionized facility undertaking no effort to have formed, join, or assist a union nonetheless have engaged in activity protected by the Act when they joined together to try to improve or protest their working conditions. But back to where I was going. So the employees' numerous attempts to raise these shared complaints they had to management, including their October 29 email replies, were clearly concerted activity for mutual aid or protection under Section 7 of the Act, and the company clearly discharged them because of the email replies. Additionally, substantial evidence supports the Board's further finding that the four employees, the four discharged employees' email replies were not so objectively egregious as to cause them to forfeit their statutory protection. And I'd like to focus on that point for a bit, if I may. Responding to an issue that was discussed during my colleague's presentation, I think she is right. I think Ms. Salazar is correct that the central issue in this case is, did the otherwise protected activity, the employees' exercise of their protected rights under Section 7 of the Act, did it go too far? Or as the case law sets forth, was it so objectively egregious as to cause them to forfeit statutory rights granted to them by Congress? And critically, it's the Board that draws that line. Do we look at — I take it Ms. Polanco is not one of the people at issue here. Correct, Your Honor, because she's not. So when we look at what — how egregious something is, do we look at Ms. Polanco's email or do we look at the emails that may agree with it 100 percent? Well, the primary focus, Your Honor, is on the reply emails of the four employees because it is their jobs that were terminated by the employer. It is the complaint allegations litigated in this case concerned only those four employees. It's their exercise of their statutory rights. And as the Board has recognized in the Crown Plaza LaGuardia case, it's the best example I can cite to you, which is in our brief, that, you know, the consequences of an employee forfeiting their statutory protection are so dramatic, so severe, that when you are analyzing the loss of statutory protection in a context where there's multiple employees involved, it's critical to focus on the conduct of each individual employee and not to go mushing them or glomming them together. That's not appropriate because it is such a severe consequence. You need to look at the conduct of each employee. So primarily, the main focus is appropriately on the four employees who replied. The Board did also look at Ms. Polanco's email and its content and determined reasonably that in context, especially in the context of this ongoing three-month effort, this email, the employer would like to present this case to the Court as if it began and ended on October 29th of 2015. And nothing could be further from the truth. This case, the story, started in August three months earlier with the hiring of Ms. Alfredo. And from that point, the employees repeatedly discussed among themselves their complaints about wages, about tip policies, scheduling, about Ms. Alfredo's disrespect. Roberts. The tip policies, they were averse to sharing their tips with runners. What are runners? So far as — it's a little unclear, Your Honor. As far as I understand, they're the equivalent of what's sometimes referred to as a busboy, I think. I'm not sure the record is clear on that. But waiters share their tips with busboys. Excuse me, Your Honor. I'm sorry. I didn't hear. Is there something wrong with waiters sharing their tips with busboys? Some of the employees complained that it was not appropriate and claimed, whether this is true, I have no idea, that it was not common in the industry for runners to have an equal share in the pooled tips. Oh, an equal share. And they also objected to the sharing of tips with Mr. Petrow, who the companies — the companies, excuse me — the employees viewed as a manager. And they felt that since he continued, in their view, to be a manager, and because in their view he continued to exercise substantial influence over people's schedules, that it was not appropriate that Mr. Petrow should have an equal cut or any cut in the pooled tips. But, Your Honor, to be clear, the wisdom of the employees' grievances is not an issue in determining their protection. That's also set forth in the Washington Aluminum case. So the four employees, the board looked at the whole context. The emails were a continuing dialogue — continued — the ongoing dialogue that had been going on for three months about all these workplace concerns. The employees were both discussing among themselves and raising to management, compiling lists, presenting them to the manager, sending emails, coordinating the filing of health department complaints. They also were a reaction to the employees' perception that management had been very indifferent to their complaints, had not sufficiently addressed their complaints, and in one instance on August 25, in the case of Ms. Alfredo, had actually coercively threatened to fire them for raising their protected concerted complaints. The four employees' replies, as we've discussed, completely devoid of any profanity, any hostility, any disparaging statements. They simply, you know, set forth in a sentence, two sentences, their general agreement with and support for Ms. Polanco's email. So viewing those — JUSTICE SOTOMAYOR — Ms. Polanco's email accuses the owners of — of criminal conduct and of — well, greed, I guess that's — that's okay, but it accuses them of criminal conduct. MS. POLANCO — Well, Your Honor, the driving message of — JUSTICE SOTOMAYOR — And you realize, I mean, that is — that's quite subversive of a — of a respectful atmosphere that has to prevail between employees and employers in order — in order to run a railroad or a restaurant. MS. POLANCO — I understand Your Honor's concerns, but respectfully, I would submit to you that the context is critical. These other isolated comments scattered throughout Ms. Polanco's email, they're not central to the driving message of the email, and none of those issues had previously been discussed or raised to management. What had been repeatedly discussed amongst the employees and presented to management were all of the protected and concerted complaints about their working conditions. So if you look at the employees' replies — and remember, Your Honor, that they're replying to this email as a unitary document — and you look at their simply stated agreement in their replies to this email as a — as a full, single document, and you look at it objectively and in the context of that three-month repeated effort, their replies — and moreover, Your Honor, Ms. Polanco says in the email, this is why she's copying her employees — her co-workers, excuse me. She's copying the co-workers on the email because she's calling them to continued action. She's saying, please, continue to stand up for your rights. Continue to stand up for what you deserve. So in that whole context, reviewing their replies objectively, they were merely expressing their agreement with and support for Ms. Polanco's criticisms of management's role in the ongoing dialogue and their perception that they were being treated unfairly. The emails were also, it's undisputed, nonpublic. These are circulated only among the management of this particular facility and about half of the employees in that facility. There's absolutely no evidence of any dissemination to anyone outside of this facility. There was, therefore, no cause of, you know, loss of business, lost customers, lost reputation. There's none of that. The Board also took account of that factor. And moreover, because the employees sent their replies undisputedly while they were not at the restaurant, while they were off-duty, on their own time, there can be no claim and there is no evidence that there was any disruption of operations. Your Honors, I have only 10 seconds left. I'm happy to answer any additional questions you have, but otherwise, the Board respectfully requests enforcement of its order in full. Thank you. Thank you, Mr. Hickson. Ms. Salazar, you have reserved three minutes for rebuttal. Yes, Your Honor. I just wanted to note that while opposing counsel concedes that there had been no other prior accusations of criminal activity, there had been no other personal attacks in any prior discussions between management and employees, and prior to those attacks, there had been no discipline. There had been no reprimands to anybody for raising any of the employment issues that they had repeatedly raised. The fact that they were consistently asking for more tips and runners run the food from the kitchen to the tables, busboys clear the tables. And the tip pool had been constructed and organized by the employees themselves. The fact that a couple of employees, waiters and waitresses, wanted a different structure, the fact that it didn't happen doesn't mean that management wasn't listening or that management didn't make a decision at its own discretion on who gets what shifts, who gets what positions and how the tips are decided. And again, while these issues may have been raised for months, there was never any indication that there was any discipline because of it. And while there may not have been any public dissemination and therefore no disparagement or defamation, there certainly was a potential loss of respect by the managers and the shareholders of Mexican Radio Corporation and in their ability to manage the other employees who were all privy to the accusations and characterizations of that email. Even though they didn't participate, they didn't actively participate. They didn't actively participate. They were all copied on the email. It certainly was directed at more people than just the ones who agreed to it. As a practical matter, the resolution in a National Labor Relations Board case requires not only that the aggrieved claimants are made whole with back wages, but that they're also provided with their job back. And then an announcement needs to be posted in a public place. Isn't the restaurant closed? The restaurant's closed. Who's going to get their job back? Well, nobody's going to get their job back, but the notice that's provided by the National Labor Relations Board details that the employers acted wrongfully in terminating these employees. That'll be posted in an empty restaurant. And it'll be mailed to all of the employees who worked for the last three years at their last known address. So the public ramifications of being found responsible for an employer under this Act, again, create an environment where activities such as what seems apparent to some, maybe, of the personal attacks and the accusations of criminal activity are not just condoned, but they're actively disseminated to the rest of the employees as activity that is supported and encouraged by the National Labor Relations Board. Were the responses sent to all of the employees? They have not been sent. No, I mean, with the 100 percent that was. Oh, correct. They were all reply all. So whoever received the original email received the responses by the other employees. Who received the original email, remind me? The original email went to the four claimants. Another original claimant who has dropped out of the, who did not move forward with a claim, and I believe another 10. I was just asking because Judge Jacobs says all employees. It was specifically those employees. It was the employees who had emails on file. Some of the employees didn't have email accounts. So those. But all the employees who had emails on file. Correct. Anybody with an email on file did receive. Got it. Yeah. Okay. Great. Thank you, Your Honor. Thank you, Ms. Salazar. Thank you, Mr. Hickson. We'll reserve decision in this case. We're going to take a five-minute recess, and we will return to hear Oneida Indian Nation versus the United States Department of the Interior. Thank you. Wow. Did you guys drive everybody away?